**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JULI MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 08-CV-0233-MJR** |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**ORDER FOLLOWING BENCH TRIAL**</u>

**REAGAN, District Judge:**

### A.   <u>Introduction</u>

Juli Moore has been employed by the Illinois Department of Corrections ("IDOC") since 1992.  In this lawsuit, Moore maintains that the IDOC interfered with her rights and retaliated against her exercising her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").

A two-day bench trial was conducted before the undersigned District Judge on June 22 and 23, 2009.  A transcript was prepared and filed on July 27, 2009.  The parties filed proposed findings of fact and conclusions of law, and this matter became ripe for ruling on October 1, 2009.

Pursuant to FEDERAL RULE OF CIVIL PROCEDURE 52, the Court now finds and concludes as follows.

### B.   <u>Findings of Fact</u>

1.      Juli Moore has been employed by the IDOC continuously since January 20,

1992.  Trial Transcript, Vol. I, 7:14-16.[1]

2.      When Moore commenced her employment with the IDOC, she was employed as a Correctional Officer at the Vienna Correctional Center ("Vienna"). Vol. I, 7:17-19.

3.      In order to become a Correctional Medical Technician ("CMT"),  a person must hold either an Illinois EMT license, an Illinois LPN license or an RN license. Vol. I, 14:10-15. In August 1995, Moore, who held an Illinois EMT license, was promoted to the position of CMT. Vol. I, 8:13-17; 14:14-15.

4.      As a CMT, Moore dispensed medication to inmates and drew blood, as well as being responsible for processing newly-arrived inmates, for sick call and for providing emergency medical assistance to inmates.  Vol. I, pp. 9-13.

5.      On February 16, 2005, Moore became a Correctional Nurse I ("CN-1").  Vol. I, 16:18-20; 24:13-15.2.

6.      The CN-1 position at Vienna entails the following responsibilities:

Under Supervision of the Health Care Unit Administrator and in conformance with established standards, procedures, policies and security guidelines, provides full range of professional nursing services in the care and treatment of inmate patients in a Correctional facility. Responsible for assigned nursing care activities utilizing professional training and expertise in the field of nursing:

40%     1. Performs a variety of nursing care functions such as, administering medications, monitoring vital signs, examining inmates using nursing assessment skills and monitoring physical condition and reactions to various treatments, obtaining laboratory specimens and providing emergency treatment; provides personal patient care such as assisting patients in eating, bathing and exercising; maintains safe and sanitary conditions in patient environment.

---

[1]The trial transcript is divided into two volumes.  Vol. 1 refers to the transcript from the first day of proceedings.  Vol. II correspondingly refers to the transcript from the second day of proceedings.

25%   2. Makes regular rounds of patients in relation to nursing duties and physician rounds; consults with physician and other professional staff regarding patient treatment and care; participates in patient treatment and management meetings; develops nursing care plans for inmates with special medical or mental health needs including those with chronic illnesses or requiring infirmary care.

10%   3. Prepares and maintains medical records and histories such as recording physician's orders, charting medications, recording patient reactions and behavior.

10%   4. Coordinates nursing functions with programs and activities within the institution; interprets policies and procedures as well as medical orders to inmates.

5%   5. Distributes medications directly to inmates as ordered by the physician. Makes daily rounds of segregation or confinement units/conducts segregation evaluations as required.  Vol. I,  17-18; Pl's Exhibit 7.

7.      Moore was promoted to the position of Correctional Nurse II ("CN-2") on February

1, 2008.  Vol. I, 23:2-6.

8.      The CN-2 position at Vienna entails the following responsibilities:

Under direction of the Health Care Administrator (Public Service Adm.), and in accordance with established standards and administrative policies of the health care unit, provides nursing services to residents of the Vienna Correctional Center on all shifts; serves as a lead worker to Corrections Medical Technicians and lower level Correctional Nurses and/or contractual nurses.

30%   1. Provides direct patient care and primary nursing care services such as medical treatments; administer medications, patient assessment; records inmates data into nursing records, initial assignment sheet; assists the physician on sick call lines; collaborates with other personnel in planning and implementing comprehensive patient care programs.

20%   2. Monitors and reviews the various functions carried out by the medical technician; instructs and explains the purpose, procedures and proper methods in carrying out the assigned duties; serve as a resource to assigned personnel in developing nursing policy and procedures.

20%   3. Reviews record keeping functions to ensure that physician orders are implemented, medications are properly charted and records of nursing care

3

and patient treatment and observations are maintained; certifies that admission interviews are conducted to determine inmates medical history, physical and mental status and facility placement.

10%  4. Serves as a lead worker; assigns and reviews work; provides input into performance evaluations; reviews time slip prior to submission to management for approval.

10%  5. Verifies adequate supply and security of medical equipment; maintains a security chain of custody on specimens required for forensic reasons; monitors safety and sanitation of treatment examination rooms, infirmary, and cell house medical treatment rooms.

05%  6. Reviews medical records and completes health summary forms for inmate transfers; reviews all inmates received in transfer.  Vol. 1, pp. 24-25; Pl's Exhibit 8.

9.      During the period that Moore worked as a CMT, she was often temporarily assigned to the position of CN-1 - collectively for a period of ten months to more than a year. Vol. I, 21:11-19.

10.     When Moore was temporarily assigned to the CN-1 position, she performed the actual job duties of that position and received an increase in pay.   Vol. I, 18:23-19:4; 21:25-22:2.

11.     At Vienna, there is little distinction between the CMT and CN-1 positions because Vienna maintains only an 8-bed observation unit and not an infirmary.  Vol. 1, 22:7-19.

12.     Moore's job duties as a CN-2 did not differ from her job duties as a CN-1.  Vol. II, 97:22-98:1.

13.     After Moore was promoted from CMT to CN-1, the CMT position at Vienna was eliminated; similarly, the CN-1 position was not filled after Moore was promoted to CN-2.  Vol. I, 29:1-3; Vol. II, 34:11-15.

14.     Moore suffers from a medical condition which causes "recurrent migraine headaches."  Vol. I, 30:2-8; Pl's Exhs. 33-35, 54-55.

4

15.     Moore has been on a non-occupational leave of absence from the IDOC since February 2009.  Vol. I, 29:13-19; Vol. II, 47:20-25.

16.     The parties agree that Moore suffers from a "serious health condition" as that term is defined by the FMLA.  Doc. 40, Final Pretrial Order, Section IV, ¶ 2.

17.     Dr. Roger Watters is Moore's personal primary care physician.  Vol. I, 32:21-23.

18.     Moore lives 14 miles from Dr. Watters's office, and she cannot receive IV therapy unless she has someone to drive her home.  Vol. II, 86:3-10.

19.     Moore can receive an IV any day of the week between 7:30 a.m. and 1:30 p.m.  Vol. II, 93:13-21.

20.     Moore's husband, who drove her to her appointments, also worked at Vienna and was off on Tuesdays and Wednesdays.  Vol. II, 58:2-4.

21.     Moore's husband worked the 11:00 p.m. to 7:00 a.m. shift.  Vol. II, 57:24-58:1.

22.     When Moore was appointed to CN-2 in February 2008, her days off were changed from Tuesday and Wednesday to Sunday and Monday.  Vol. II, 85:5-13.

23.     After Moore's days off were changed to Sunday and Monday, her husband also changed his days off to Sunday and Monday.  Moore then withdrew her request to have her days off changed back to Tuesday and Wednesday.  Vol. II, 69:17-20.

24.     Around 1997, Moore first communicated with her supervisor at Vienna about her head pains.  Vol. I, 31:19-32:5.

25.     In November 1999, Dr. Karen Pentella wrote a letter to the IDOC explaining:

Juli E. Moore has been under my care for intractable migraine headaches. She is presently receiving preventative medication for these headaches but this has not been entirely effective. I am continuing to make adjustments in this preventative medication. She has also been given medications which she takes for symptomatic

5

relief of her headaches which include Maxalt and Fioricet. Migranal, a nasal spray, is also being tried. Neither the Migranal or the Maxalt should affect her ability to function at work and she could take them while she is at work. Although we are trying to prevent her headaches, it is possible that an occasional headache may be severe enough that she would be unable to work. She will be seen for regular follow up as we try to maximize treatment of this chronic condition. Pl's Exhibit 77.

26.     Over the years, Moore had more than 10 conversations about her medical condition with Yolande Johnson. Vol. I, 35:11-20; 36:25-37:6. Johnson, who served as Assistant Warden of Programs at Vienna from August 2002 to April 2007, was responsible for supervision of the Health Care Unit at that time. Vol. II, 112:17-18; 113:8-17. When Johnson returned to Vienna, serving as Warden from September 2007 to November 2008, she had direct supervisory authority over the Health Care Unit because there was no Assistant Warden of Programs at that time. Vol. II, 112:17-18; 122:9-18.[2]

27.     Prior to traveling to the Mayo Clinic, in December 2004, to meet with a neurologist regarding her treatment, Moore told Warden Johnson that she did not know how many sick days she would need because doctors there might want to run additional tests. Vol. I, 58:14-25.

28.     Between April and October, 2004, Moore explained to Warden Johnson that her condition was worse; she had changed her treatments; and she had no idea what to expect. She also discussed the possibility of missing work. Vol. I, 61:20-25.

29.     Moore did not apply for FMLA approved leave prior to January 2007 because she believed that she had enough sick time and did not need FMLA. Vol. II, 63:12-19.

30.     Moore was aware that she was required to use a specific form to request FMLA leave. Vol. II, 50: 2-10.

---

[2]For simplicity's sake, the Court will refer to Ms. Johnson as "Warden Johnson" in both capacities - Assistant Warden and Warden.

31.     The IDOC policy that discusses the information an employee must provide in the event of absence because of illness reads:

> All employee requests for sick time usage must be supported by a Notification of Absence and Call-In Report, DC 314-F, signed by the employee. The DC 314-F shall be provided to the supervisor no later than forty-eight hours after the employee's return from absence(s), unless extenuating circumstances exist which are approved by the supervisor. The supervisor will ensure that the DC 314-F is readily available to the employee. Failure of an employee to provide such will result in the absence being considered unauthorized. The employee will be docked and a disciplinary referral will be initiated.  Pl's Exhibit 12 (internal footnote omitted).

32.     On May 28, 2006, Moore wrote a letter to Warden Johnson explaining:

> A sick slip for 5-11-06 was provided to A.W. Johnson on the first day back to work (5-13-06).... [A]ll the medical information required for proof was provided.  <u>No further information should be required and any information pertaining to my diagnosis and prognosis that you have requested me to provide would be a violation of the Federal Privacy Act.</u>  However, several documents have been provided (to A.W. Johnson) in the past given to her both by myself and Sgt. Henderson (when I was a Med. Tech. and he was Chief Union Steward). These documents included information about my chronic condition and my prognosis coming from different doctors, including specialists. Therefore, no more documentation should be needed to approve the sick slip for 5-11-06.   Threatening dock status is a form of intimidation and should not be allowed when the appropriate medical documentation has been provided.  Pl's Exhibit 62 (emphasis in original).

33.     Moore submitted numerous off-work slips to the IDOC indicating that she was absent because of her medical condition.  *See* Pl's Exhs. 39-47.

34.     On January 15, 2007, Moore provided Warden Johnson with a Medical Certification Form under the FMLA from Dr. Watters.  The certificate provided that Moore suffered from a medical condition that began in 1997, that was of indefinite duration and that required her to take off from work "intermittently."  Pl's Exh. 55.

35.     Since February 2007, Moore has taken FMLA leave for her "recurrent migraine headaches."  Doc. 40, Final Pre-Trial Order, § IV, ¶ 10.

36.     In 2007, Warden Johnson repeatedly approved requests for "substitution of time - FMLA - comp time."  *See* Pl's Exh. 2, pp. 30, 34-37.  Oddly, on the November 4 and December 15, 2007  requests, the words "no & no" appear, even though Warden Johnson approved the requests.  *Id*. at  30, 35.  Also, on the December 15 request, the words "request substitution of time - FMLA - comp time" are lined out.  *Id*., 35.

37.     In January 2008, Warden Johnson had training on "the new law of FMLA."  Vol. II, 132:19-24.   After that change, Warden Johnson did not allow the substitution of accrued compensation time for FMLA sick time for any employees who were on FMLA.  Vol. II, 116:25-117:6; 132:15-18.  However, Warden Johnson was unable to identify any documents that supported the change in policy.  Vol. II, 117:9-15;  119:24-120:11.

38.     Accrued compensation time could be used for an absence related to inclement weather but not for an FMLA absence.  Vol. II, 119:9-13.

39.     On January 8, 2008, Moore provided Warden Johnson with another Medical Certification Form under the FMLA from Dr. Watters.  This certificate again provided that Moore suffered from a "chronic condition since 1997" that required her to take off work intermittently depending on the recurrence of headache.  Pl's Exh. 54.

40.     Warden Johnson disapproved Moore's requests for substitution of accrued compensation time for FMLA sick time on January 25, March 21and March 25, 2008.  Pl's Exh. 2, pp. 44, 54, 55.

41.     On March 25, 2008, Moore arrived at Vienna about 25 minutes prior to the time she was required to arrive for her shift, which was 10:45 p.m.  Vol. II, 17:9-22.  Moore did not sign the sign-in sheet because she realized that she was too sick to work because of her FMLA-related

medical condition.  Exh. 76; Vol. II, 20:8-11, 21:25-22:5.  She went to the Health Care Unit and told Nurses Jeff Brown and Cami Jestis that she was too sick to work and was going home.  She also called Director of Nursing Stephanie Smallman.  Vol. II, 20:13-17.  Moore completed a Notification of Absence slip, which lists the time at 10:20 p.m., indicating that she would be unable to work her shift.  Pl's Exh. 2, p. 55.

42.  Smallman wrote up an incident report, in which she indicated that Moore had abandoned her assignment.  Def's Exh. 30.  The nurse's station is a mandatory post which requires 24/7 staffing, and Moore was working alone there that night.  Vol. II, 75:10-17.  Smallman did not understand Moore to say that she would be unable to work her shift and would not have written up the incident report if Moore had told her that she was not medically able to work her shift.  Vol. II, 111:3-10.  Smallman would have had to cover the shift or find someone else to cover it.  Vol. II, 111:7-13. Assistant Warden Cox referred Moore for discipline because "after reporting for her regularly scheduled shift, [she] took it upon herself to depart the facility and abandon her assignment without proper authorization or approval."  Pl's Exh. 67; Vol. II, 75:22-76:7.

43.  As a result of the referral for discipline, Moore had a hearing before an Employee Review Board Officer who decided not to impose any discipline, a decision in which Warden Johnson concurred.  Vol. II, 76:8-23.

44.  Moore was never disciplined for any days that she took off.  Vol. II, 76:24-77:1.

45.  When Warden Hathaway was at Vienna, Moore spoke with Administrative Assistant Debbie Bishop about scheduling FMLA leave in advance.  Vol. II, 33:11-14.

46.  Bishop advised Moore that Warden Hathaway would appreciate it if she would schedule her days off in advance so that they would know the possibilities of overtime.  Vol. II, 14-

16.

47.     When Warden Johnson replaced Warden Hathaway, Moore could not schedule an FMLA day in advance but had to call in her FMLA time each day.  Vol. II, 33:16-22.

48.     On February 1, 2008, Moore sent a note to Warden Johnson stating, "I am waiving my contractual rights for weekend days off until further notice. I am requesting my RDO's be returned to Tues & Wed. due to medical necessity. I am also waiving my 10 day notice for days off change."  Pl's Exh. 69.

49.     On February 19, 2008, Warden Johnson responded:

I have read your recent request for special consideration for days off due to medical necessity. Prior to making a decision on your request documentation must be received that indicates such necessity.

In the meantime, your days off will remain Sunday/Monday as you have been previously notified.  Pl's Exh. 68.

50.     On February 22, 2008, Dr. Watters sent a letter to the Warden's office, which read:

Julie Moore has been under my care for the past several years. She has a problem with severe, recurrent migraine type headaches. She has been referred to multiple headache clinics, pain clinics, and neurologists, including referral to Mayo Clinic, Headache Clinic. Over this time there have been very few things which have allowed her to get any relief from her headache. She does require injections of Nubain and Phenergan and also has been treated by IV infusions of Depakote. This has been recommended by a previous neurologist sometimes this does give her some relief from the headaches, in spite of this she has continued to work steadily as a nurse.

She has tried to obtain her injections and treatments on her days off. In the past she has been off on Tuesdays and Wednesday and has been able to come into the office and get injections on those days. She also has received some IV infusions of Depakote when needed. Recently, her schedule has been changed so that she is now off on Sunday and Monday. This makes it impossible for her to get her usual treatment because most physician offices, including mine, are not open on Sunday. She also has a driver available to help her on the Tuesday and Wednesdays, who is not available on Sunday or Monday. Therefore, it would be extremely helpful if her scheduled days off could be on Tuesday and Wednesdays so that she could continue to receive her treatments and not have to miss work.  Pl's Exh. 38.

51.     Warden Johnson did not allow Moore to return to her original Tuesdays and Wednesdays off.  Vol. II, 125:2-4.

52.     Because inmates were transferred in and out of Vienna on Tuesdays and Wednesdays, it was "necessary or beneficial" to have two nurses there.  Prisoners being transferred into Vienna received orientation on the intake process from the nurses on the 11-7 shift.  Nurses on this shift also prepared inmates for transfer out by making sure that their medications and files were ready to go.  Additionally, they prepared labs for the day shift and took care of early morning labs, such as fasting blood work.  Vol. II, 133:20-135:2.

53.     On March 1, 2006, March 28, 2007, and February 22, 2008, Warden Johnson prepared annual performance evaluations indicating that Moore needed improvement in her use of time because of the number of days she was absent from work and the number of absences that were unscheduled.  Pl's Exhs. 3-5.  All employees who called in sick more than five times were marked in the evaluations as needing improvement.  Vol. II, 131:17-23.

54.     In response to Warden Johnson's comments, Moore wrote that her absences were caused by a documented, chronic health condition.  Pl's Exhs. 3-5.  Additionally, she wrote that she was not permitted to submit her FMLA days off in advance, and, consequently, it was impossible to schedule them.  Pl's Exh. 3.

55.     Moore's pay and prospects for promotion were not affected by her evaluations, nor was she disciplined because of them.  Vol. II, 130:21-131:9.

56.     On October 10, 2006, a job vacancy was posted at Vienna for the position of CN-2.  Pl's Exh. 9.

57.     On October 18, 2006, Moore submitted an application for the posted CN-2 position.

11

Pl's Exh. 51.

58.     In her application for the CN-2 position, Moore listed as her experience the CMT position from August 1995 to January 2005 and her CN-1 position from February 2005 to the time of the application.  Pl's Exh. 51.  In the application, Moore made no mention of any temporary assignment as CN-1.  *Id*.

59.     Warden Johnson's administrative assistant, Debbie Bishop, was responsible for setting up interviews and, in conjunction with the Central Office in Springfield,  making certain that the appropriate people were being interviewed.  Vol. II, 144:14-18.

60.     Bishop took the applications for the October 2006 CN-2 position and submitted them to the Central Office.  Vol. II, 144:23-145:3.

61.     The Department of Central Management Service ("Central Management") determined which applicants were eligible for the CN-2 position.  Vol. II, 145:7-14.  Central Management is an agency created by statute which is separate and distinct from the IDOC.  20 ILCS 5/5-15; 20 ILCS 405/405-1 *et seq.*

62.     When  Central Management sent Bishop the list of those eligible for the CN-2 position,  Moore was listed as ineligible because she did not have the experience, *i.e.,* three years of experience as a registered nurse.  Vol. II, 145:18-146:1.

63.     Bishop told Moore that she was not interviewed for the CN-2 position because she did not have the required three years progressive experience for the position.  Vol. I, 78:17-79:1.

64.     Moore asked Bishop if the years when she had been temporarily assigned as a CN-1 had been counted, and Bishop told her that temporary assignment did not count.  Vol. I, 79:3-5.

65.     On December 28, 2007, Central Management's Qualification Review indicated that

12

Moore was approved for 4(d)5 (CN-2) appointment.  Pl's Exh. 52.

66.     Moore's salary in July 2006 was $4714 per month.  Pl's Exh. 23.  Her salary increases during the relevant time period were as follows: January 1, 2007, $4761 per month; February 1, 2007, $4929 per month; July 1, 2007, $5077 per month; January 1, 2008, $5229 per month; February 1, 2008, $5690 per month (as a result of her promotion to CN-2).  Pl's Exhs. 17, 19, 20, 21.

## C.     Conclusions of Law

### FMLA Interference Claim

1.     The FMLA entitles an eligible employee who suffers from a serious health condition that renders her unable to perform the functions of her position to twelve weeks of leave during each twelve-month period. **29 U.S.C. § 2612(a)(D)**.

2.     In enacting the FMLA, Congress authorized the Secretary of Labor to promulgate regulations necessary to carry out the FMLA.  ***See* 29 U.S.C. § 2654.**

3.     Under the Department of Labor regulations, "interference" with rights under the FMLA occurs when there are "Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights under the Act. **29 C.F.R. § 825.220(b)**.

4.     The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." **29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a)(1); *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)**.

5.     "When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave.  The issue of the employer's intent is immaterial." ***Rice v. Sunrise Express*, 209 F.3d 1008,**

**1016-17 (7th Cir. 2000)**.

6.      The regulations interpreting the FMLA provide that an employee is entitled to take "intermittent or reduced leave," which is defined as follows: "FMLA leave may be taken 'intermittently or on a reduced leave schedule' under certain circumstances. Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason." **29 C.F.R. § 825.202(a)**.

7.      The FMLA regulations provide that "[i]f an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt the employer's operations." **29 C.F.R. § 825.203**.

8.      To prevail on a claim of interference under the FMLA, an employee must establish five things: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. ***Burnett v. LFW, Inc.***, **472 F.3d 471, 477 (7th Cir. 2006)**.

9.      Interference by its nature requires that the plaintiff show that the defendant interfered with a substantive right guaranteed to the plaintiff under the FMLA. ***King v. Preferred Technical Group***, **166 F.3d 887, 891 (7th Cir. 1999)**.

10.     Where a plaintiff is not prevented from taking leave under the FMLA there is no interference. ***De La Rama v. Ill. Dept. of Human Servs.***, **541 F.3d 681, 687-688 (7th Cir. 2008) (holding there was no interference where it was undisputed that the plaintiff had taken the FMLA leave)**.

14

11.    Where the plaintiff fails to prove that she has been prejudiced by the employer's violation of the FMLA, 29 U.S.C. §2617 affords the plaintiff no remedy.  ***Harrell v. United States Postal Serv.*, 445 F.3d 913, 928-29 (7th Cir. 2006)**.  "The employer is liable only for compensation and benefits lost 'by reason of the violation,' § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B)."  *Id*.

12.    Moore's claim that the IDOC interfered with her FMLA rights when it referred her for discipline on March 25, 2008, fails.  Although Moore established the first three elements necessary to prevail on a claim of interference under the FMLA, she failed to show that she provided sufficient notice of her intent to take leave and that her employer denied her FMLA benefits to which she was entitled.  The nurses' station must be staffed 24/7, and Moore was working alone on March 25.  Finding of Fact 42.  She left the facility without adequately advising Director of Nursing Smallman, who was responsible for making sure that the shift was covered, that she was medically unable to work.  *Id*.  The Court concludes that Moore did not provide sufficient notice of her intent to take leave.  Moreover, ultimately, her employer did not prevent her from taking FMLA leave, and she was not disciplined.  Finding of Fact 43.  Consequently, Moore has failed to show that the IDOC interfered with her FMLA rights when she was referred for discipline when she left her post.

13.    Moore failed to prove that the IDOC interfered with her FMLA rights when Warden Johnson noted on her performance evaluations (2005-2006, 2006-2007, 2007-2008) that she needed improvement in her use of time.  First, the work performed and days absent for the February 2005 through February 2006 and February 2006 through February 2007 evaluations almost entirely predate Moore's January 2007 request for FMLA leave.  Second, on the whole, Moore's

performance evaluations improved after she applied for FMLA leave, with Warden Johnson marking

for the first time that Moore exceeded expectations in certain categories.  Pl's Exhs. 3-5; Vol. II,

83:10-12.   Third, Moore was not prevented from exercising her FMLA rights because of the

performance evaluations, nor was she disciplined.   Neither her pay nor her opportunity for

promotion was impacted by FMLA-related absences.  Consequently, Moore has failed to prove that

the IDOC interfered with her FMLA rights by marking her performance evaluations as needing

improvement in her use of time.

14.   Moore failed to carry the burden of showing that the IDOC interfered with her FMLA

rights when it refused to allow her to substitute compensatory time for FMLA leave.   Warden

Johnson testified that, according to her January 2008 FMLA training, an employee could not

substitute compensatory time for FMLA leave.  Vol. II, 116:25-117:6.  That policy was subsequently

changed, and an employee can now substitute compensatory time for FMLA leave.  Vol. II, 119:18.

Assuming, *arguendo*, that Moore is correct and the IDOC policy, as explained by Johnson, violated

the FMLA, Moore fails to prove that she has been prejudiced by that violation - and without

prejudice, the FMLA affords her no remedy.  Compensatory time may be used by an employee to

schedule time off, or the employee may be paid for it at the end of the fiscal year.  Vol. II, 70:10-15.

Although the IDOC policy then in place prevented Moore from substituting her compensatory time

for FMLA leave, she was paid for her compensatory time at the end of the fiscal year.  Vol. II,

70:25-71:21.  Moore conceded that she made the same amount of money whether or not she had a

compensatory day.  Vol. II, 71:22-24.  Additionally, it is the law of the case that evidence and

testimony regarding compensatory damages beyond those allegedly incurred as a result of not being

promoted to a CN-2 were excluded from trial because (1) Moore did not timely claim three days

(docked pay) because she was not allowed to use her compensatory time; (2) these three days of damages were not disclosed in time for verification of these damages through discovery; and (3) the specific compensatory damages she claimed as a result of not being able to substitute compensatory time for sick leave time were not vetted due to late disclosure. Doc. 43, Order on Motion in Limine. Importantly, too, Moore was allowed to take the requested FMLA leave and was not disciplined. As a result, the Court concludes that Moore suffered no prejudice from having requests to substitute compensatory time for FMLA leave denied.

15.     Moore has failed to prove that the IDOC interfered with her FMLA rights by changing her days off. The FMLA does not mandate this accommodation, which is more a matter of convenience than of medical necessity. Moore admitted that she did not submit an FMLA request asking to have all of her Tuesdays and Wednesdays off on FMLA leave. Vol. II, 74:1-4. Moore also conceded that her FMLA paperwork showed that the frequency of treatment depended on recurrence of the headaches, which was unpredictable, and that she was unable to say what days she would be absent. Vol. II, 64:1-67:25. None of the forms submitted by Moore indicated that she needed treatment every Tuesday. Vol. II, 67:23-25; Pl's Exhs. 33-35, 54-55. In a letter dated March 5, 2007, Dr. Watters wrote that as long as Moore worked the 11-7 shift, she could get her treatment any weekday, relatively early in the morning, and would be able to function well by the time she was due to report to work. Pl's Exh. 37; *see also* Pl's Exh 60 ("with the 11p - 7a shift I can receive treatment in the early am and report to work at 10:45 pm"). Given these facts, when Moore had Sundays and Mondays off, she could have taken her treatments on Monday morning and suffered no ill effects when she returned to work for her regular shift. As to the availability of her husband to drive her to her appointments, he also worked the 11-7 shift; he had his days off changed to

17

Sunday and Monday to coincide with hers, at which time she withdrew her request to have Tuesdays and Wednesdays off.  Vol. II, 69:17-20.  Moore has shown no prejudice suffered as a result of not having her preferred days off.  She was able to receive her treatments and incurred no lost wages or other damages as a result of having her days off changed.

16.     Moore has failed to prove that the IDOC interfered with her FMLA rights by requiring her to call in every day she was absent.  Indeed, Moore concedes in her post-trial brief that this requirement does not constitute an independent violation of the FMLA.  Pl's Post-Trial Brief, p. 34.  Because requiring Moore to call in each day that she was absent concededly does not violate the FMLA, Moore has shown no prejudice suffered as a result of this policy.

### *FMLA Retaliation Claim*

1.     A retaliation claim under the FMLA requires proof of discriminatory or retaliatory intent.  ***Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)**.

2.     Retaliation may be proven by either the direct or indirect method.  ***Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004)**.  "There are two types of permissible evidence under the direct method: direct evidence and circumstantial evidence.  The former 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'  The latter is evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'"  ***Id*. (citation and internal citations omitted)**.

3.     To succeed under the direct method, a plaintiff must present evidence that (1) her employer took materially adverse action against her (2) on account of her protected activity.  ***Burnett*, 472 F.3d at 481**.

4.     Materially adverse actions include not only employment-related activities but "any

actions that would dissuade a reasonable employee from exercising [her] rights under the FMLA." *Breneisen v. Motorola, Inc.*, **512 F.3d 972, 979 (7th Cir. 2008)**.

5.      In the absence of direct evidence, the plaintiff can proceed under the indirect method and prove that, "after taking FMLA leave ... [she] was treated less favorably than other similarly situated employees who did not take FMLA leave, even though [she] was performing [her] job in a satisfactory manner." ***Burnett***, **472 F.3d at 481-82,** *citing Hull v. Stoughton Trailers, LLC*, **445 F.3d 949, 951 (7th Cir. 2006)**.  Because Moore has not identified a similarly situated person treated more favorably than she, she must proceed under the direct method of proof.

6.      Moore has not proven that the IDOC retaliated against her for taking FMLA leave by denying her promotion to the CN-2 for which she applied in October 2006.  First, the IDOC cannot have denied Moore this promotion in retaliation for her taking FMLA leave because she did not apply for FMLA approved leave until January 2007.  Finding of Fact 29.  Moore had not sought FMLA leave for her headaches prior to January 2007 because she thought she had enough sick time and did not need FMLA leave.  Vol. II, 63:12-15.  Because Moore did not seek to invoke her FMLA rights before January 2007, she may not now argue that her employer retaliated against her for taking FMLA leave by denying her the promotion to CN-2 in 2006.  *See Ridings v. Riverside Medical Center*, **537 F.3d 755, 762 (7th Cir. 2008),** *citing Bailey v. Southwest Gas Co.*, **275 F.3d 1181 (9th Cir. 2002)**. Second, in order to be eligible for the position, Moore was required to have "3 years progressively responsible nursing exp.;..." Pl's Exh. 9.  Moore's application for the CN-2 position did not reflect that she was ever temporarily assigned as a CN-1 during the 10 years that she was a CMT.  Vol. II, 55:10-13.  The Court finds no retaliatory intent in the fact that Moore was told in December 2006 - when she had been a CN-1 for only 1 year and 10 months - that she lacked

the requisite experience, but in December 2007 - when she had been a CN-2 for 2 years and 10 months - that she was approved for the CN-2 position. Even though Moore was short two months' experience when her application was approved, she became a CN-2 almost exactly three years after she became a CN-1, from February 2005 to February 2008. Vol. II, 56:1-5. These facts actually cut against Moore's position because her application was rejected *prior* to her applying for FMLA leave but approved ahead of schedule *after* she applied for FMLA leave. Moreover, the decision regarding whether Moore was qualified for the CN-2 position was made not by the IDOC but by Central Management, a separate department, on both the 2006 and 2007 applications. Vol. II, 145:22-146:1; Pl's Exh. 52.

7.     Moore has failed to prove that the IDOC retaliated against her for taking FMLA leave when it changed her days off in February 2008. For the reasons explained above (Conclusion of Law 14), Moore has not proven that she needed Tuesdays and Wednesdays off - as opposed to preferring to have those days off - to seek treatment or to have her driver available. Consequently, she has not shown that by changing her days off the IDOC took a materially adverse action "that would dissuade a reasonable employee from exercising [her] rights under the FMLA." **Breneisen, 512 F.3d at 979**. Warden Johnson explained that Moore's regular days off were changed when Moore accepted the promotion to CN-2 because those days off were associated with the position and because the Health Care Unit needed to be fully staffed for the inmate transfers that occurred on Tuesdays and Wednesdays. Vol. II, 133:9-22. Nurses on the 11-7 shift provided orientation to inmates transferring into the facility, including  reviewing their files and determining if any medications were needed; they prepared inmates who were transferring out of the facility by making sure that no files were left behind and that their medications were ready to go. Vol. II, 134:19-

135:20.  In sum, Moore has failed to prove that the IDOC retaliated against her for taking FMLA leave by changing her days off.

### *Injunctive relief*

1.      "A district court is given broad discretion to fashion an equitable remedy that makes whole a plaintiff who has been discriminated against by his employer. **Bruso v. United Airlines, Inc., 239 F.3d 848, 863 (7th Cir. 2001),** *citing EEOC v. Gurnee Inn Corp.***, 914 F.2d 815, 817 (7th Cir. 1990)**). "A court may use expungement as a means of removing the stain of the employer's discriminatory actions from the plaintiff's permanent work history. **Id.,** *citing Sherkow v. Wisconsin Dep't of Pub. Instruction***, 630 F.2d 498, 504 (7th Cir. 1980) (stating that the district court properly ordered the defendant to expunge from the plaintiff's personnel file a poor performance evaluation written in retaliation for the plaintiff's public exercise of her right to be free from gender discrimination**).

2.      The relevant inquiry when determining whether a particular plaintiff is eligible for injunctive relief "is whether the employer's discriminatory conduct could possibly persist in the future."  **Id.** at 864, *citing EEOC v. Ilona of Hungary, Inc.***, 108 F.3d 1569, 1578-79 (7th Cir. 1997) and** *Dombeck v. Milwaukee Valve Co.***, 40 F.3d 230, 238 (7th Cir. 1994)**).

3.      Moore seeks equitable relief that would obligate the IDOC to remedy the lingering effects of actions that are impermissible under the FMLA and to prohibit the conduct from reoccurring in the future.  The Court has thoroughly considered Moore's contentions and the record in this case and, as set forth in detail above, finds no actions by the IDOC that were impermissible under the FMLA.  Moore's contention that equitable relief is appropriate under the facts of this case is without merit.

21

**D.     Conclusion**

Accordingly, having carefully reviewed the voluminous evidence in this FMLA case, the Court **FINDS** in favor of Defendant, Illinois Department of Corrections, and against Plaintiff, Juli Moore.  The Clerk of Court is **DIRECTED** to enter judgment in favor of the IDOC and against Moore.

**IT IS SO ORDERED.**

**DATED this 16th day of December, 2009**

**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**

22